E-FILED
Monday, 24 August, 2015  03:39:27 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **MICHELLE KAVANAGH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 12-3346** |
| | ) | |
| **C.D.S. OFFICE SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Before the Court are the Defendant's Motion for Summary Judgment (d/e 51) and the Plaintiff's Motion to Strike Defendant's Response to Additional Fact #193 as Non-Responsive and an Improper Attempt to Add a New Fact (d/e 55). Because a number of questions of material fact prevent granting summary judgment on the Plaintiff's claims, the Defendant's Motion for Summary Judgment is denied. Additionally, the Plaintiff's Motion to Strike is denied because the Defendant did not violate Local Rule 7.1(D)(3)(a) in its response to the Plaintiff's Additional Fact #193.

# I. <u>BACKGROUND</u>

This case arises out of an alleged retaliatory firing of the Plaintiff, Michelle Kavanagh, by the Defendant, C.D.S. Office Systems, Inc. (CDS), in response to actions Kavanagh took related to the Fair Labor Standards Act (FLSA).  Kavanagh began working for CDS, which provides information technology services, on February 21, 2011, under the title of "HR Director."  Ex. 85, d/e 51-9 at 2627.  Kavanagh's direct supervisor was CDS's Chief Financial Officer, Bruce Egolf.  Def.'s Am. Ans., d/e 19 at 2.  Egolf in turn reported to the two main directors of the company, Jerome "Jay" Watson and Jay's son, Mark Watson.  <u>Id.</u>  Egolf testified that Kavanagh's duties included payroll, accounts payable, acting as the liaison between CDS employees and CDS's benefit providers, attendance keeping, and completing equal employment opportunity reports.  Egolf dep., d/e 51-20 at 16-17, 22.  Kavanagh disputed this characterization and stated that her duties also encompassed a number of human resources activities, such as administering CDS's health and retirement plans, maintaining employee records, and recruiting and interviewing new employees.  Pl.'s Supp. Ans. to

Def.'s Interrogs., d/e 52-26.

## A. CDS Experienced Financial Troubles and Began Planning to Outsource Its Payroll Services.

During Kavanagh's term of employment at CDS, CDS experienced financial difficulties.  In February 2011, after CDS's previous CFO was terminated as part of a reduction in force, Egolf was promoted from Comptroller to CFO.  Ex. 95, d/e 51-14; Egolf dep., d/e 51-20 at 64.  Egolf then discovered that CDS had a deficit of $1.5 million in its accounts receivables.  Egolf dep., d/e 51-21 at 125-26.  As a result, CDS had trouble securing financing, with its existing bank informing CDS that it no longer wanted to work with CDS.  Id. at 129-30.  Around this time, Egolf testified that he had Kavanagh prepare a spreadsheet showing how much money CDS could save by reducing all employee salaries, as well as a spreadsheet demonstrating possible ways for CDS to reduce expenses.  Id. at 131-34.  However, Kavanagh asserted that CDS never actually implemented these plans.  Pl.'s Resp. to Def.'s Mot. for Sum. J., d/e 52 at 26.

At least partly as a result of these financial difficulties, from

October 4, 2010, to June 29, 2012, CDS's employee count declined from 146 to 118.  Ex. 95, d/e 51-14.  Between January 2012 and July 3, 2012, seven total employees were terminated, consolidated, or had their positions left unfilled after resigning.  Id. at 0386.  However, the parties dispute the reasons for this reduction, as CDS's documentation does not specify whether departing employees resigned, were terminated for cause, or were terminated as part of a reduction in force.  See id.; Ex. 94, d/e 51-13; Egolf dep., d/e 51-22 at 269-279.  Egolf testified that regardless of the reasons for several employees' departures, CDS did not fill their vacant positions, resulting in a significant reduction in force.  Egolf dep., d/e 51-22 at 269-279.  Kavanagh disputed Egolf's characterization of this reduction, and pointed to a number of positions that actually were filled.  See Ex. 94, d/e 51-13; Ex. 95, d/e 51-14; Ex. 109, d/e 52-24; Ex. 202, d/e 52-25.

Also during Kavanagh's time at CDS—and as a result of the financial hardships CDS was facing—CDS began talks with several outside companies about outsourcing CDS's payroll services.  In December 2011, Egolf responded to an email from a salesman at an

outside payroll company, Automated Data Processing, Inc. (ADP), who had previously attempted to schedule a meeting with Egolf, to set up a meeting on January 10, 2012, to discuss outsourcing CDS's payroll functions.  Egolf dep., d/e 51-21 at 140.  Egolf and Mark and Jay Watson then viewed a presentation of ADP's technology on February 15, 2012.  Ex. 74, d/e 51-7; Egolf dep., d/e 51-21 at 143.  On March 19, 2012, Felicia Squires, an accountant at CDS, emailed Egolf stating that Jay Watson had told her that he did not want to hire ADP to take over CDS's payroll, but that he did want to fire Kavanagh by April 2 and hire another accountant to help with payroll and accounts payable.  Ex. 36, d/e 51-3.  The email did not explain why Jay Watson wanted to fire Kavanagh, but Squires later testified that Watson did not want to fire Kavanagh specifically, rather that he wanted to eliminate her position to reduce costs.  Squire dep., d/e 51-27 at 24.  Egolf testified that there was an understanding among himself, Squires, and the Watsons by March 2012 that Kavanagh's position would be eliminated after CDS outsourced its payroll responsibilities.  Egolf dep., d/e 51-21 at 159-60.  Egolf also testified that he was working

to secure a new loan for CDS at that time and would not be able to set a date for terminating Kavanagh until the loan was secured. Egolf dep., d/e 51-22 at 216.  Egolf and Squires also discussed firing Kavanagh in vague terms via email on May 1 and May 17, 2012.  Ex. 49, d/e 51-17; Ex. 50, d/e 51-4.  CDS secured the bank financing in mid-June.  Egolf dep., d/e 51-20 at 7.

Returning to CDS's outsourcing efforts, on March 21, 2012, Egolf emailed accountant Tim Cravens of Pehlman & Dold, who was the accountant in charge of CDS's account at that firm, asking for advice about outsourcing CDS's payroll.  Ex. 75, d/e 51-8.  Cravens responded that Pehlman & Dold could possibly handle CDS's payroll, and Egolf began communicating with Linda Buckles, Pehlman & Dold's head bookkeeper, about getting a quote for those services.  Id.  On April 11, 2012, Egolf and Cravens signed a proposal for Pehlman & Dold to provide CDS's payroll services, though the proposal did not include a date on which Pehlman & Dold would begin handling CDS's payroll.  Id. at 0486.  Cravens and Buckles testified that Pehlman & Dold set July 1, 2012 as the date that they would take over CDS's payroll work, as that was the

end of a financial quarter and the start of CDS's new fiscal year.
Cravens dep., d/e 51-19 at 20, 26; Buckles dep., d/e 51-18 at 17-
18.  On June 19, Egolf sent Buckles several emails with CDS
employee information to be used in Pehlman & Dold's work for
CDS.  Ex. 87, d/e 51-10 at 0483-85.  Buckles testified that the
information "was not to do payroll," but "was to start putting
information in for the employees."  Buckles dep., d/e 51-18 at 24.
Buckles also emailed Egolf on June 22 to tell him that "I think we
are going to need to sit down and go over a few things. . . .  I also
need to talk about any changes you would like to see, for instance
something you would like to have but could not get with your
system."  Ex. 87, d/e 51-10 at 0482.

At some point before July 1, 2012, Buckles realized that
Pehlman & Dold's computer system would not be ready to take over
CDS's payroll services by July 1.  Buckles dep., d/e 51-18 at 22-23.
Buckles first testified that she realized she would have difficulties
setting up CDS's payroll in "[p]robably July," id. at 22, but she also
testified that she would have realized that the system would not be
ready to handle CDS's payroll "[p]robably sometime in June, or

May," <u>id.</u> at 29, and that she "probably" would have told CDS about

the problem in June 2012, <u>id.</u> at 23.[1]  After several months of

delays, Pehlman & Dold began processing CDS's payroll in

December 2012.  <u>Id.</u> at 25; Cravens dep., d/e 51-19 at 20-21.

### B. Kavanagh Undertook FLSA-Related Activities and Was Terminated Soon After.

While Kavanagh worked for CDS, she took several HR-related

actions in support of employees' rights.  On March 3, 2011,

Kavanagh asked Egolf about whether a CDS employee who was not

exempt under the FLSA should be clocking in and out, as he was

not registered in CDS's time-tracking system.  Ex. 64, d/e 52-14.

On March 23, 2011, Kavanagh emailed Egolf and Jay Watson to

warn them that they may have been violating Illinois law by

---

[1] The specific exchange was:

    Q.  Did you ever communicate to CDS during June leading up to when payroll was about to begin that this might take longer than you thought?

    A.  Oh, I probably did because I wasn't going to be ready July 1 so I would have told them.

    Q.  And you would have told them that probably in June?

    A.  Yes.

Buckles dep., d/e 51-18 at 23.

delaying sending a commission payment to an employee who had recently left CDS.  Ex. 66, d/e 52-15.  Kavanagh also emailed Egolf on March 23 to tell him that CDS's vacation policy should be updated to account for the fact that Illinois law required CDS to pay employees for unused vacation time.  Ex. 67, d/e 52-16. On April 11, 2011, Kavanagh asked Egolf whether a CDS employee was entitled to overtime pay.  Ex. 68, d/e 52-17.  Kavanagh discussed whether a salaried employee should be clocking in and out with Egolf on July 14, 2011.  Ex. 69, d/e 52-18.  Furthermore, Kavanagh testified that she talked to CDS's Vice-President of Operations, Robert Milner, about the implications under the FLSA of employees not taking lunch breaks.  Kavanagh dep., d/e 52-24, at 148; R. Milner dep., d/e 51-26 at 27-28.  Kavanagh sent an article to Milner about that topic on August 18, 2011, titled "Lunch and Breaks—'Little' Violations, But Fines Add Up Quickly," in an email with the subject line "FLSA Rules [W]e Discussed."  Ex. 71, d/e 52-19.  On April 11, 2012, Kavanagh emailed Egolf about her concern that CDS could be audited under the FLSA and that CDS may have been improperly classifying two branch administrators as

exempt under the FLSA and two as non-exempt.  Ex. 73, d/e 52-20 at 3177-79.  Egolf responded that there was no difference between the branch administrators' duties, and that "they should all be non-exempt."  Id. at 3177.  Kavanagh then asked Egolf, "Don't you think we should find out what their duties are before we go changing the FLSA status?"  Id.  Egolf did not respond.

Kavanagh's most significant HR-related actions for purposes of this case began on May 29, 2012, when Kavanagh sent out an HR newsletter to several CDS supervisors titled "FMLA, ADA, FLSA and More: The 10 Employment Laws Every Manager Should Know."  Ex. 13, d/e 51-1 at 579.  CDS's IT Manager, Scott Brown, responded to Kavanagh's email and asked to meet to discuss overtime pay with her.  Id.  On June 1, 2012, Kavanagh met with Brown and two IT engineers, Dakota Kennedy and Bob Goldesberry, to discuss whether CDS's IT engineers should be entitled to overtime pay under the FLSA.  Kavanagh dep., d/e 51-24 at 122; ex. 45, d/e 52-12.  A few days later, on June 6, Kavanagh emailed Egolf suggesting that CDS could be misclassifying several employees as exempt from the FLSA's overtime requirements, including Goldesberry and

Kennedy.  Ex. 13, d/e 51-1 at 1-2.  Kavanagh suggested that CDS
needed to make a number of changes to ensure that it was in
compliance with the FLSA, including keeping track of non-exempt
employees' hours.  Id.  Egolf forwarded Kavanagh's email to Jay and
Mark Watson with the message "I told you something was up...".
Ex. 13, d/e 51-1 at 1597.

On June 7, 2012, Egolf and Jay and Mark Watson called an
attorney with the Business Technology Association, Robert
Goldberg, for a free consultation about FLSA issues.  The call lasted
between 10 and 20 minutes.  Goldberg dep., d/e 51-23 at 25-26; J.
Watson dep., d/e 52-32 at 43.  Goldberg did not recall what
occurred during the call.  Goldberg dep., d/e 51-23 at 25-26.  Jay
Watson testified that Goldberg "didn't tell us a great deal.  So we—
we weren't sure what to do."  J. Watson dep., d/e 52-32 at 42.
Watson further stated that the call "wasn't very long because
[Goldberg] really didn't give us what we were wanting.  We wanted
some kind of an opinion or how to rectify if there was a problem and
he really didn't go to that extent.  We went to him to begin with
because he was free, to be honest."  Id. at 43.  Mark Watson

testified that Goldberg gave them a "legal suggestion," and that they developed a "flex plan" in response to Kavanagh's FLSA inquiry.  M. Watson dep., d/e 51-25 at 28, 32.  Egolf also testified that he thought CDS management had decided to use a "flex-time policy" to address possible FLSA compliance issues, and that the overtime concerns were resolved as a result.  Egolf dep., d/e 51-20 at 68.

However, the flex plan was never put in writing.  M. Watson dep., d/e 51-25 at 33; J. Watson dep., d/e 52-32 at 46.  Mark Watson and Egolf also did not know who communicated the existence of the flex plan to CDS's employees.  M. Watson dep., d/e 51-25 at 34; Egolf dep., d/e 51-20 at 75.  Mark Watson testified that the flex plan went into effect sometime in 2012 after June 6. M. Watson dep., d/e 51-25 at 32-33.  Bob Goldesberry, on the other hand, testified that he was unaware that a flex plan was instituted after June 6, 2012.  Goldesberry dep., d/e 52-29 at 19.  Gail Milner, who was an IT purchasing employee at CDS, testified that she was unaware that CDS had a flex plan.  G. Milner dep., d/e 52-31 at 38.  Kavanagh also testified she had never heard of a flex plan while she was at CDS.  Kavanagh dep., d/e 51-24 at 172.

On June 13, 2012, Kavanagh sent an email to Egolf following up on Kavanagh's June 6 email and asking if they could meet to discuss Kavanagh's concerns about CDS's compliance with the FLSA.  Ex. 13, d/e 51-1 at 5.  Kavanagh also emailed Egolf a document on June 15 titled "Service Techs FLSA."  Id. at 562.

Kavanagh met with Egolf later in the day on June 15, 2012. Egolf dep., d/e 51-20 at 81-82; Kavanagh dep., d/e 51-24 at 172-73; Ex. 40, d/e 52-11.  Kavanagh and Egolf contest what occurred during this meeting.  Egolf first testified that he did not recall meeting on June 15 at all.  Egolf dep., d/e 51-20 at 80-82. Kavanagh testified that Egolf asked her why Bob Goldesberry and Dakota Kennedy came to her with their overtime complaints and Kavanagh explained that it was because she was the HR Director. Compl., d/e 1 at 3-4; Kavanagh dep., d/e 51-24 at 172-73. Kavanagh stated that she felt like under the FLSA, CDS's computer technicians were owed overtime pay.  Compl., d/e 1 at 4; Kavanagh dep., d/e 51-24 at 172-73.  According to Kavanagh, Egolf stated that he was not surprised that Goldesberry had complained about overtime because "Bob likes to complain and stir up trouble," but

that he was surprised by Dakota Kennedy's complaint because Kennedy was Jay Watson's step-grandson.  Id.  Kavanagh testified that Egolf told her he thought that Kennedy only complained because Goldesberry encouraged him to, and that he would need to talk to Kennedy's step-mother (and Jay Watson's daughter), Kelly Kennedy, about getting Dakota to stop complaining.  Id.

Kavanagh testified that Egolf then asked her, "How can we make this go away?," to which she responded, "Bruce, we can't make this go away, the law is what the law is and as an employer we will have to follow it."  Id.  Kavanagh claimed that Egolf then told her, "I need for you to make this go away," to which Kavanagh again replied, "I can't."  Id.  Kavanagh testified that she told Egolf that Goldesberry and Kennedy were not the only CDS employees who were misclassified under the FLSA, and that she believed that half of CDS's IT engineers were misclassified as non-exempt.  Id.  Kavanagh stated that Egolf told her, "Then make them all exempt," and Kavanagh responded that the FLSA required classification based on employees' job duties.  Compl., d/e 1 at 5; Kavanagh dep., d/e 51-24 at 172-73.  Kavanagh next told Egolf that CDS would

need to track the IT engineers' time.  Id.  Kavanagh suggested performing an audit of all of CDS's employees to determine whether they were properly classified under the FLSA, and she testified that Egolf told her to perform that audit.  Id.  Kavanagh claimed that she also asked Egolf about conducting performance reviews, and Egolf told her, "You just need to stay safe."  Id.

Egolf testified that he may have discussed Kavanagh's concerns about CDS's lack of compliance with the FLSA, but he did not remember saying that he would talk to Kelly Kennedy about getting Dakota Kennedy to stop complaining.  Egolf dep., d/e 51-20 at 82-86.  Egolf denied telling Kavanagh to make the FLSA issue "go away" and telling her that she just needed to "stay safe."  Id. at 84-85.  Egolf also did not recall asking or authorizing Kavanagh to complete an FLSA audit.  Id. at 87.

After the June 15 meeting, Kavanagh began working on her FLSA audit.  Ex. 13, d/e 51-13 at 662-63, 543-44, 658, 1623-24, 3288-89, 3284-85, 572-74.  On June 21, 2012, Kavanagh emailed Gail Milner asking for information about CDS employees to complete her FLSA audit classifications.  Ex. 22, d/e 52-6.

Kavanagh sent a follow-up email to Milner on June 26 that stated "I really need this information so I can finish my report and get it to Bruce [Egolf]." Id.  Milner forwarded that email to Egolf with the message "I don't think a proper response would be, 'Really!? Because he told me to ignore your request.'"  Id.  Egolf responded to that email by stating "No, I don't think that would be appropriate. But 'month/fiscal year end is more important than this.  I'll get it to you as soon as I am able.'"  Id.  Milner then sent Kavanagh a response echoing Egolf's suggestion.  Ex. 23, d/e 52-7.

On June 26, 2012, Kavanagh placed her completed audit, which broke down each employee's status under the FLSA, on Egolf's chair.  Ex. 13, d/e 51-1 at 11-12.  Egolf testified that he did not pass the audit along to the Watsons.  Egolf dep., d/e 51-20 at 95.  However, Scott Brown testified that he met with Jay Watson after June 26 and that Watson had a copy of the audit with him. Brown dep., d/e 52-34 at 53-55.   Kavanagh sent a follow-up email to Egolf on June 27 stating that she left the audit on Egolf's chair. Ex. 13, d/e 51-1 at 13.  The email also discussed some of the legal tests under the FLSA and concluded that several CDS employees

should be considered non-exempt under the FLSA.  Id. at 13-14.
Egolf sent a response email stating, "This is very helpful, as well as
the first report.  I'll be taking up this matter with Jay/Mark and our
attorney."  Id. at 3265.  Kavanagh then sent an email to Egolf on
June 28 containing job descriptions for the IT engineers, as that
information was relevant to how those employees should be
classified under the FLSA.  Id. at 3264.

Kavanagh sent an email to Dakota Kennedy on July 3, 2012,
explaining that she met with Egolf about overtime issues on June
15, that Egolf asked her to perform an FLSA audit of CDS, and that
she submitted that audit to Egolf on June 27.  Id. at 588.
Kavanagh forwarded her email to Kennedy to Scott Brown.  Id.
Kavanagh was fired by Egolf later that day in a meeting with Egolf
and Felicia Squires.  See Def.'s Rep. to Pl.'s Resp. to Def.'s Mot. for
Summ. J. at 26.  Neither Jay nor Mark Watson met with Kavanagh
regarding her termination.  J. Watson dep., d/e 52-32 at 20-22; M.
Watson dep., d/e 51-25 at 11.  Kavanagh testified that she was
shocked by her termination, and that when she asked Egolf if there
were any other positions that she could fill at CDS, Egolf told her

there were not.  Kavanagh dep., d/e 51-24 at 153.  Egolf sent an email to all of CDS's employees stating that Kavanagh had been fired, that HR issues would be handled by Egolf, Squires, and Kelly Kennedy, and that payroll would be outsourced "in the very near future."  Ex. 9, d/e 52-2.  Kelly Kennedy was Jay Watson's daughter and did not have HR experience.  Egolf dep., d/e 51-20 at 115.  Egolf testified that he chose to fire Kavanagh on July 3 because that date was after the end of CDS's fiscal year and "[i]t would give [him] a couple days to start [his] month end close and then [they'd] be done."  Id. at 97.  Egolf also testified that the Watsons decided to fire Kavanagh in April 2012 when CDS signed the contract with Pehlman & Dold and that she was fired as part of a reduction in force because her position was eliminated.  Id. at 42-43.  Egolf and Jay Watson testified that Kavanagh was not fired due to job performance issues.  Id. at 6; J. Watson dep., d/e 52-32 at 13.  Additionally, Egolf and Mark and Jay Watson testified that they did not believe that Kavanagh began her FLSA advocacy because she knew that her position was going to be eliminated and she was attempting to protect herself from being fired.  Egolf dep., d/e 51-20

at 61-62; M. Watson dep., d/e 51-25 at 55; J. Watson dep., d/e 52-33 at 54.

After Kavanagh was fired, Dakota Kennedy emailed Egolf asking who would address his FLSA complaint in light of Kavanagh's termination.  Ex. 13, d/e 51-1 at 1874.  Egolf forwarded that email to Jay and Mark Watson, stating, "We will need to address this issue with Dakota."  Ex. 12, d/e 51-3.  Egolf testified that CDS paid Kennedy for "something like" 16 hours of overtime afterwards.  Egolf dep., d/e 51-20 at 100.  Kennedy was the only CDS IT engineer to receive overtime pay at this time.  Ex. 204, d/e 52-27.  The only other employee who received overtime pay at any point was Bob Goldesberry, who was paid overtime in 2009 after complaining to his supervisor.  Goldesberry dep., d/e 52-29 at 16.

Regarding CDS's handling of employee complaints, Jeff Greer, a former CDS employee, testified that:

> Well, one of the jokes at CDS sometimes was, you know, as long as you don't question the reports, then you'll keep your job. So if you're not questioning upper management and if you're not saying, well, I'm not sure these numbers match up, or add up, or as long as you're just kind of a "yes" man and just go along with it, you're kind of safe in your role.

But when people started trying to get structure and
definitive answers and things like that, it's kind of when
they were, well, maybe you're not working out, or maybe
we need to downsize this position, even though somebody
would probably be hired in that position next week.  It
seemed like it was just a constant cycle.  As long as
you're in there and saying yep, yep and always do and
not questioning, fine.

Greer dep., d/e 52-33 at 47-48.  Bob Goldesberry also testified that

he did not bring his overtime complaint to the Department of Labor

because, after meeting with Kavanagh on June 1, 2012,

At that point I felt like it was—it was—it was
decided and I felt like it was—I had to make a decision at
that point whether or not I wanted to put, you know,
myself, you know, in a position where I was going to be
going up against the company.
And, to be honest with you, even though I was
complaining about the conditions and I was still thankful
to have a job and that I was not going to take it any
further, and I did it—I felt like I went through the official
way to do it, and at that point I just did not want to—I
felt like if I did that, I would probably get in trouble, and I
did not want to go that far so I just stopped.

Goldesberry dep., d/e 52-29 at 50-51.  Additionally, Scott Brown

testified that when Jay Watson met with Brown about Kavanagh's

audit, Watson "was angry that [Brown] didn't talk to him about it

first, and mentioned that if [CDS] had to pay the guys overtime that

it would cause financial hardships to the company."  Brown dep.,

d/e 52-34 at 91.

Brown also testified that he got the impression from Watson that CDS would not pay the IT engineers overtime pay regardless of what Kavanagh suggested.  Id. at 54-55.  Jay Watson testified that he "[could]n't recall exactly" whether he had told Brown that paying overtime would bankrupt CDS.  J. Watson dep., d/e 52-32 at 54-55.  Mark Watson testified that the only actions that CDS took in response to the FLSA complaints were the call to Goldberg and the institution of the flex plan.  M. Watson dep., d/e 51-25 at 34.  Egolf testified that CDS did not do anything with the FLSA-related documents that Kavanagh produced before she was fired.  Egolf dep., d/e 51-22 at 341.  CDS also never consulted with their primary law firm, Sorling Northrup, about FLSA compliance.  M. Watson dep., d/e 51-25 at 39; J. Watson dep., d/e 52-32 at 48-49; Egolf dep., d/e 51-20 at 95.

Kavanagh filed suit against CDS on December 14, 2012.  See Compl., d/e 1.  Kavanagh brought claims against CDS for retaliatory discharge in violation of the FLSA (Count 1), retaliatory discharge under Illinois common law (Count 2), and violation of the

Illinois Whistleblower Act (Count 3).  CDS filed a Motion to Dismiss

Counts 1 and 2 of Kavanagh's Complaint (d/e 5), which the Court

denied.  See Op. of Jan. 7, 2014, d/e 12.  CDS moved for summary

judgment against Kavanagh's claims on January 15, 2015.  See

Def.'s Mot. for Summ. J., d/e 51.  Kavanagh filed a Response to

CDS's Motion (d/e 52), and CDS filed a Reply to Kavanagh's

Response (d/e 53).  Kavanagh then filed a Motion to Strike one of

Kavanagh's factual responses in its Reply (d/e 55), to which CDS

filed a Response (d/e 57).

## II.  **LEGAL STANDARDS**

Summary judgment is appropriate where the record, viewed in

the light most favorable to the nonmovant, reveals that there are no

genuine issues as to any material fact, meaning that the moving

party is entitled to a judgment as a matter of law.  Fed. R. Civ. P.

56(a); Trentadue v. Redmon, 619 F.3d 648, 652 (7th Cir. 2010)

(noting that all reasonable inferences must be drawn in favor of the

nonmovant).  The party moving for summary judgment bears the

burden of establishing the absence of any genuine issues of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Once the movant has met this burden, the nonmovant must present evidence sufficient to create triable issues of fact on each of the essential elements of her claim.  Trentadue, 619 F.3d at 652. The court simply determines whether there is a genuine issue of fact for trial without weighing the evidence or evaluating the credibility of the parties and witnesses.  Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001).

Summary judgment should be denied when a court is required to "resolve conflicting deposition testimony."  Wilson v. Chicago, Milwaukee, St. Paul, & Pac. R. Co., 841 F.2d 1347, 1349 (7th Cir. 1988).  Rather, "[w]hen two individuals give contradictory accounts of a situation of which they have personal knowledge, and both accounts are plausible, the decision as to which is correct must await trial before the factfinder; 'summary judgment is not a procedure for resolving a swearing contest.'"  Damato v. Jack Phelan Chevrolet Geo, Inc., 927 F. Supp. 283, 288 (N.D. Ill. 1996) (quoting Jackson v. Duckworth, 955 F.2d 21, 22 (7th Cir.1992)); see also Wilson v. Williams, 997 F.2d 348, 350 (7th Cir. 1993) (reversing summary judgment "[b]ecause the district court

impermissibly made credibility determinations").

### III.  <u>ANALYSIS</u>

CDS argues that it is entitled to summary judgment on Kavanagh's claims because Kavanagh's position was terminated as part of a legitimate reduction in force when CDS outsourced its payroll services, meaning that Kavanagh was not fired for retaliatory reasons.  Def.'s Mot. for Summ. J., d/e 51 at 1-2.  CDS also argues that Kavanagh's claim under the Illinois Whistleblower Act fails because Kavanagh did not establish that she refused to perform an illegal act.  <u>Id.</u> at 26-27.  Kavanagh responds that questions of material fact prevent summary judgment on her claims and that she did refuse to perform an illegal act by refusing to go along with Egolf's directive to make the IT engineers' FLSA complaints "go away."  Pl.'s Resp. to Def.'s Mot. for Summ. J., d/e 52 at 2-5, 67-68.  Kavanagh also filed a motion to strike one of CDS's responses to her statements of fact.  Pl.'s Mot. to Strike, d/e 55.

### A.  **Kavanagh's Motion to Strike Is Denied.**

Kavanagh argues that CDS's response to one of her additional

facts was "non-responsive and an improper attempt to add a new fact."  Pl.'s Mot. to Strike, d/e 55 at 1.  In her Additional Fact #193, Kavanagh stated that "Plaintiff was shocked about her termination and asked Egolf whether there might be other positions that she could fill at CDS.  Egolf told her there were no such positions."  Pl.'s Resp. to Def.'s Mot. for Summ. J., d/e 52 at 42.  In its Reply, CDS responded that,

> Defendant concedes that the allegations in paragraph 193 are material but they are disputed.  Plaintiff could not have been shocked about her termination considering Plaintiff had informed her husband three or four months before she was let go that CDS was outsourcing payroll and that Plaintiff was "kind of wondering what she was going to be doing."  (Dan Kavanagh, 19)  Plaintiff was concerned that outsourcing payroll would somehow impact her employment at CDS because "she had mentioned that was a big part of her job responsibilities." (Dan Kavanagh, 20)  It is undisputed, but immaterial that there were no other positions then available which Plaintiff could fill at CDS.

Def.'s Rep. to Pl.'s Resp. to Def.'s Mot. for Summ. J., d/e 53 at 26.  CDS also attached the deposition of Dan Kavanagh to their Reply.  See D. Kavanagh dep., d/e 54-1.

Kavanagh argues that CDS's response to Additional Fact #193 violated Local Rule 7.1(D)(3)(a), which provides that if a party

concedes that an additional fact is material but argues that it is disputed, the party must "provide support [for] the claim that the fact is disputed by providing citations to specific pages of evidentiary documentation" and "[i]nclude as exhibits all cited documentary evidence not already submitted." L.R. 7.1(D)(3)(a)(2). Kavanagh contends that CDS violated the Local Rule because their response was "wholly unresponsive and introduces a new fact which was not included in its original Statement of Facts in its Motion for Summary Judgment," meaning that "Plaintiff has never had an opportunity to dispute this fact with appropriate cites to the record." Pl.'s Mot. to Strike, d/e 55 at 2. For that reason, Kavanagh argues that the Court should strike CDS's response. Id. Alternatively, Kavanagh asks that the Court consider Kavanagh's arguments raised in opposition to CDS's response to Additional Fact #193. Id. In those arguments, Kavanagh contends that Dan Kavanagh's testimony about Kavanagh's knowledge of CDS's future outsourcing is irrelevant to whether she was shocked when she was fired. Pl.'s Mem. of Law in Supp. of Mot. to Strike, d/e 56 at 3. Kavanagh argues that the only proper sources to dispute

Kavanagh's assertion would be testimony from Egolf or Squires, who were actually present when Kavanagh was fired and could testify to what her reaction was.  Id.

The Court finds that CDS did not violate Local Rule 7.1(D)(3)(a) and that there is no need to strike CDS's response to Additional Fact #193.  CDS was entitled to dispute the proposition raised by Kavanagh in Additional Fact #193, and Local Rule 7.1(D)(3)(a)(2) expressly provides for CDS's ability to introduce new evidence in doing so.  Kavanagh may disagree about the relevance of her ex-husband's testimony to whether Kavanagh was "shocked about her termination," but Dan Kavanagh's testimony is at least relevant enough to be considered responsive to Kavanagh's assertion. Therefore, Kavanagh's Motion to Strike (d/e 55) is denied.  The Court will, however, consider CDS's response to Kavanagh's Additional Fact #193 to be disputed for the reasons expressed in Kavanagh's Memorandum in Support of Her Motion to Strike (d/e 56).

**B. Questions of Material Fact Prevent Summary Judgment on Kavanagh's FLSA and Illinois Common Law Claims.**

CDS moves for summary judgment on Kavanagh's claims under the FLSA and Illinois common law for retaliatory discharge. CDS's arguments for summary judgment on Kavanagh's claims focus exclusively on the causation element of the claims, so the Court's analysis will do the same. CDS argues that because it had a number of legitimate reasons to fire Kavanagh, Kavanagh cannot establish that she was fired because of her FLSA-related activity. However, Kavanagh has raised a number of factual disputes as to the legitimacy of CDS's stated justifications and as to the possibility that those justifications were pretextual. Therefore, if a jury sided with Kavanagh, the jury could find that CDS fired Kavanagh in retaliation for her FLSA-related activities.

Kavanagh's evidence is sufficient for a jury to find that, even if CDS was going to terminate Kavanagh as a result of outsourcing its payroll services, she was fired earlier than she otherwise would have been due to her FLSA advocacy. Key among Kavanagh's evidence is Linda Buckles's testimony that she likely told CDS that she would not be ready to handle CDS's payroll services by July 1, 2012. Buckles dep., d/e 51-18 at 23. If a jury credits that

testimony, CDS's justification for firing Kavanagh when they did would be significantly weakened.  Furthermore, when the facts are construed in Kavanagh's favor, a jury could doubt CDS's justification based on CDS's hostility to FLSA complaints, CDS's lack of a response to the IT engineers' complaints after firing Kavanagh, and Jay Watson's angry discussion about Kavanagh's audit with Scott Brown a few days before Kavanagh was fired, <u>see</u> Brown dep., d/e 52-34 at 91.  Kavanagh also disputed much of CDS's evidence about its reduction in force, weakening that justification for Kavanagh's firing.  Through this evidence, Kavanagh effectively raises questions of material fact on CDS's justification for firing Kavanagh, such that a jury could find CDS's stated justification was a pretext for a retaliatory firing.

CDS characterizes Kavanagh's argument that CDS used its outsourcing to Pehlman & Dold as a pretext for firing Kavanagh as requiring an "astonishing inference" that CDS kept Pehlman & Dold "'on-hold' for an indefinite period of time, as insurance in case Kavanagh ever brought suit."  <u>See</u> Def.'s Rep. to Pl.'s Resp. to Def.'s Mot. for Summ. J. at 26.  CDS misunderstands Kavanagh's

argument.  Kavanagh does not argue—nor does she need to argue—that CDS set up its contract with Pehlman & Dold simply so that it would have a cover to fire Kavanagh because of her FLSA-related activities.  Rather, Kavanagh argues that, while CDS had plans to eventually outsource its payroll work to Pehlman & Dold, those plans were indefinite until Kavanagh began pushing for FLSA compliance.  At that point, CDS accelerated its plans to outsource payroll as an excuse to fire Kavanagh even though, when the facts are construed in Kavanagh's favor, CDS knew that Pehlman & Dold would not actually be ready to begin managing CDS's payroll in July 2012.

The Court recognizes that CDS may have fired Kavanagh eventually because it was outsourcing its payroll services.  However, Kavanagh has presented evidence that CDS knew that Pehlman & Dold would not be prepared to assume CDS's payroll work in July 2012, which could allow a jury to find that CDS used the Pehlman & Dold outsourcing as a pretext to prematurely fire Kavanagh.  This sort of premature termination, if caused by an illegal retaliatory motive, would be considered an adverse employment action.  See

Baker v. United Def. Indus., Inc., No. CIV A 1CV-05-2643, 2006 WL
3486445, at *4 (M.D. Pa. Dec. 1, 2006) (finding that a plaintiff
suffered an adverse employment action when, even though the
defendant made an earlier decision to fire the plaintiff, "Defendant
terminated Plaintiff sooner because of his EEOC complaint,"
meaning that the plaintiff "suffered direct economic harm for those
days he would have been employed but for Defendant's retaliation");
Hernandez v. Wangen, 938 F. Supp. 1052, 1062 (D.P.R. 1996)
(denying summary judgment against a plaintiff who showed that
her employer may have terminated her before the previously
scheduled elimination of her position because she filed a complaint
with the EEOC).  Kavanagh's evidence of CDS's hostility to FLSA
complaints and overstatement of CDS's reduction in force could
make a jury even more likely to infer that CDS prematurely fired
Kavanagh because of her FLSA advocacy.

Kavanagh also argues that she had a number of HR-related
duties beyond working on payroll, meaning that CDS's statements
about firing her as a result of outsourcing their payroll work could
be pretextual.  This argument may hold some merit, but the

argument's strength is undercut by the fact that CDS management had been discussing firing Kavanagh as far back as March 2012, well before she began actively pushing CDS to comply with the FLSA.  <u>See</u> Ex. 36, d/e 51-3.  As a result, Kavanagh could have a difficult time convincing a jury that CDS only invented the payroll excuse to fire her after she began her FLSA-related activities.  Nonetheless, this factor is still relevant in determining whether outsourcing payroll to Pehlman & Dold would actually justify firing Kavanagh.  If a jury believed that Kavanagh performed substantial activities beyond payroll work, the jury may be more likely to find that CDS used the Pehlman & Dold outsourcing as a pretext to fire Kavanagh.

In sum, Kavanagh's evidence of CDS's possible knowledge that Pehlman & Dold would not be ready on July 1, 2012, as well as her evidence of CDS's resistance to FLSA compliance and her counter-arguments to CDS's reduction in force evidence, create questions of material fact about whether CDS's stated reasons for firing Kavanagh were a pretext for a retaliatory firing in violation of the FLSA and Illinois common law.  Therefore, CDS's motion for

summary judgment on Kavanagh's FLSA and Illinois common law
retaliatory discharge claims must be denied.

### C. Kavanagh Has Established an Illegal Act to Support Her Illinois Whistleblower Act Claim.

CDS argues that it should be granted summary judgment on
Kavanagh's claim under the Illinois Whistleblower Act because
Kavanagh has not established that she refused to participate in an
illegal act.  Under the Illinois Whistleblower Act, "[a]n employer may
not retaliate against an employee for refusing to participate in an
activity that would result in a violation of a State or federal law,
rule, or regulation."  740 ILCS 174/20.  To bring a claim under the
Illinois Whistleblower Act, a plaintiff must show that (1) she refused
to participate in an illegal act, and (2) her employer retaliated
against her because of that refusal.  Sardiga v. N. Trust Co., 948
N.E.2d 652, 657 (Ill. App. Ct. 2011).

CDS argues that, even if Kavanagh did refuse to make the IT
engineers' FLSA complaints "go away," she has not established that
her actions constituted a refusal to participate in an illegal act
because she has not shown that the IT engineers actually had valid

claims under the FLSA.  However, Kavanagh has presented
sufficient evidence for a jury to find that CDS was violating the
FLSA by not giving its IT engineers overtime pay.  The record
contains a number of emails that Kavanagh sent explaining why
she believed CDS was violating the FLSA.  <u>See</u> Ex. 13, d/e 51-1 at
1-2, 11-14.  If a jury agreed with Kavanagh's evidence that CDS's IT
engineers were entitled to overtime pay, then the jury could find
that by refusing to participate in CDS's policy of denying those
employees overtime pay, Kavanagh was refusing to participate in an
illegal act.  Furthermore, as discussed in the previous section, there
is sufficient evidence for a jury to find that Kavanagh was fired for
her refusal to participate in CDS's violations of the FLSA.
Therefore, a jury could find that CDS violated the Illinois
Whistleblower Act and summary judgment on Kavanagh's claim
must be denied.

## IV.  <u>CONCLUSION</u>

For those reasons, CDS's Motion for Summary Judgment (d/e
51) and Kavanagh's Motion to Strike (d/e 55) are DENIED.  The
Court will schedule final pretrial conference and trial dates at the

telephonic conference set for Wednesday, August 26, 2015, at 11:00

AM.

ENTER: August 24, 2015.

s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE